IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| KIMBERLY JOHNSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:22-CV-242-X-BH |
| | § | |
| SOUTHWEST RECOVERY SERVICES | § | |
| INC., et al., | § | |
| | § | |
| Defendants. | § | Referred to U.S. Magistrate Judge[1] |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Based on the relevant filings and applicable law, *Defendant Experian Information Solutions, Inc.'s Motion to Compel Arbitration and Stay Proceedings Pending Arbitration and Memorandum of Law in Support of Motion*, filed June 3, 2022 (doc. 44), should be **GRANTED in part** and **DENIED in part**.

## I. BACKGROUND

Kimberly Johnson (Plaintiff) brings this action against Experian Information Solutions, Inc. (Defendant) and other defendants, for alleged violations of the Fair Credit Reporting Act (FCRA), the Fair Debt Collection Practices Act (FDCPA), the Texas Debt Collection Act (TDCA), and the Deceptive Trade Practices Act. (doc. 7 at 2.)[2] She contends Defendant knew her credit report was not accurate but provided false reports anyway, and that it failed to update or delete inaccurate information despite receiving notice of the inaccuracies, conduct a lawful reinvestigation, forward all relevant information to the furnishers, and maintain reasonable procedures to verify information, instead

---

[1] By *Special Order 3-251*, this *pro se* case has been referred for full case management, including the determination of non-dispositive motions and issuance of findings of fact and recommendations on dispositive motions.

[2] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

relying on verification from unreliable sources.  (*Id.* at 23-25.)

On March 21, 2018, Plaintiff enrolled in IdentityWorks, an online credit monitoring service provided by Experian Consumer Services (ECS), an affiliate of Defendant. (doc. 44-1 at 3.) To successfully complete the enrollment, a user had to enter her personal information on a webform before clicking the "Submit Secure Order" button at the bottom of the form. (*Id.*) Immediately above this button was the following disclosure: "By clicking 'Submit Secure Order': I accept and agree to your Terms of Use Agreement, as well as acknowledge receipt of your Privacy Policy and Ad Targeting Policy." (*Id.* at 3-4.) The phrase "Terms of Use Agreement" was a hyperlink (off-set in blue text) and, if clicked, the entire text of the current version of the Terms of Use Agreement would be displayed within the user's web browser. (*Id.*)  The Terms of Use Agreement in effect on March 21, 2018 (2018 TOU Agreement), contained an amendment clause that states that the "Agreement may be updated from time to time" and that "[e]ach time you order, access or use any of the Services or Websites, you signify your acceptance and agreement, without limitation or qualification, to be bound by the then current Agreement." (docs. 44-1 at 4-5; 44-5 at 4.)

From between March 21, 2018 and June 3, 2022, Plaintiff downgraded, upgraded, and switched into different ECS memberships and purchased products from ECS more than 65 times. (doc. 44-1 at 5.) When Plaintiff re-enrolled in IdentityWorks online on March 22, 2022, she completed a web upgrade form that asked for her credit card information. (*Id.* at 6.) Immediately below the boxes for the information was the following notice:

> By clicking "Submit Secure Order": I accept and agree to your Terms of Use Agreement, as well as acknowledge receipt of your Privacy Policy. I authorize Consumerinfo.com, Inc. also referred to as Experian Consumer Services ("ECS") to obtain my credit report and/or credit score(s), on a recurring basis to provide them to me for review while I have an account with ECS. I also authorize ECS to obtain and use the information I provide, and my credit report and/ or credit score(s), on a

recurring basis to notify me of credit opportunities and other products and services that may be available to me through ECS or through unaffiliated third parties. I understand that I may withdraw this authorization at any time by contacting ECS.

(doc. 44-1 at 7.) As with the March 2018 enrollment form, the phrase "Terms of Use Agreement" was hyperlinked, and if clicked, would display the current version of the Terms of Use Agreement. (*Id.*) To complete the transaction, Plaintiff had to click the "Yes, Upgrade Me to IdentityWorks Premium" button at the bottom of the form. (*Id.* at 6-7.)

The Terms of Use Agreement in effect on March 22, 2022 (2022 TOU Agreement) states:

You agree that by creating an account with ECS (as defined below), or accessing or using our Services (as defined below), website(s) (such as this website, https://usa.experian.com, or any affiliated website (including, but not limited to, Experian.com, FreeCreditReport.com, FreeCreditScore.com, CreditReport.com, Creditchecktotal.com, CreditScore.com, usa.experian.com, and experian.experiandirect.com)), or mobile applications (such as the Experian app), as well as any content provided or accessible in connection with the website(s) or mobile application(s), including information, user interfaces, source code, reports, images, products, services, and data (each website and mobile application referred to herein as a "Website," and collectively, as "Websites"), you represent to ECS that you have read, understood, and expressly consent and agree to be bound by this Terms of Use Agreement, and the terms, conditions, and notices contained or referenced herein ("Agreement") whether you are a "Visitor" (which means that you simply browse or access a Website), or a "Customer" (which means that you have created an account with ECS, or enrolled or registered with a Website, or are accessing or using a Service).

(doc. 44-6 at 2.) The agreement specifies that "the terms 'we,' 'us' or 'ECS' refer to ConsumerInfo.com, Inc., an Experian company (also known as Experian Consumer Services), and referred to as 'Experian' on the Websites, its predecessors in interest, successors and assigns, *affiliates*, and any of its third party service providers (including, without limitation, cloud service providers) who ECS uses in connection with the provision of the Services to you." (*Id.* (emphasis added)).

The 2022 TOU Agreement has the same amendment clause found in the 2018 TOU

3

Agreement. (*Id.* at 4-5.) It also contains an arbitration provision that provides, in relevant part:

> ECS and you agree to arbitrate all disputes and claims between us arising out of or relating to this Agreement to the maximum extent permitted by law, except any disputes or claims which under governing law are not subject to arbitration. This agreement to arbitrate is intended to be broadly interpreted and to make all disputes and claims between us directly relating to the provision of any Service and/or your use of any Website subject to arbitration to the fullest extent permitted by law. The agreement to arbitrate includes, but is not limited to:

> claims arising out of or relating to any aspect of the relationship between us arising out of any Service or Website, whether based in contract, tort, statute (including, without limitation, the Credit Repair Organizations Act) fraud, misrepresentation or any other legal theory; claims that arose before this or any prior Agreement (including, but not limited to, claims relating to advertising); claims that are currently the subject of purported class action litigation in which you are not a member of a certified class; and claims that may arise after the termination of this Agreement.

> For purposes of this arbitration provision, references to "ECS," "you," and "us" shall include our respective parent entities, subsidiaries, affiliates (including, without limitation, our service providers), agents, employees, predecessors in interest, successors and assigns, websites of the foregoing, as well as all authorized or unauthorized users or beneficiaries of Services and/or Websites or information under this or prior Agreements between us relating to Services and/or Websites. Notwithstanding the foregoing, either party may bring an individual action in small claims court. You agree that, by entering into this Agreement, you and ECS are each waiving the right to a trial by jury or to participate in a class action to the maximum extent permitted by law. This Agreement evidences a transaction in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this arbitration provision. This arbitration provision shall survive termination of this Agreement.

>                                         \*\*\*

> All issues are for the arbitrator to decide, including the scope and enforceability of this arbitration provision as well as the Agreement's other terms and conditions, and the arbitrator shall have exclusive authority to resolve any such dispute relating to the scope and enforceability of this arbitration provision or any other term of this Agreement including, but not limited to any claim that all or any part of this arbitration provision or Agreement is void or voidable.

(doc. 44-6 at 7-8.)

Based on that provision, Defendant moves to compel arbitration and stay the proceedings

pending arbitration. (doc. 44.)

## II.  EVIDENTIARY OBJECTIONS

Plaintiff appears to challenge the admissibility of the declaration of David Williams and the supporting documents it references. (doc. 51 at 2-3.)

"To determine if evidence in support of a motion to compel arbitration is admissible, courts apply the same standard as that applied to a motion for summary judgment." *Domain Vault, LLC v. Rightside Group, Ltd.*, 3:17-CV-0789-B, 2018 WL 638013, at *3 (N.D. Tex. Jan 30, 2018).  In the summary judgment context, evidence need not be in a form admissible at trial "so long as it is capable of being presented in an admissible form." *Trujillo v. Volt Mgmt. Corp.*, 846 F. App'x 233, 236 (5th Cir. 2021) (citing *Maurer v. Independence Town*, 870 F.3d 380, 384 (5th Cir. 2017)).

### A.    Personal Knowledge

Plaintiff appears to argue that Williams lacks personal knowledge of the information contained in his declaration. (doc. 51 at 2.)

A "declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the ... declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). The Federal Rules of Evidence further require that a "witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. Personal knowledge may be proved by a witness's or a declarant's own testimony, or reasonably inferred from his position or the nature of his participation in the matters to which he swears. *See id.*; *Am. Motorist Ins. Co. v. Southcrest Constr. Inc.*, No. 3:04-CV-2575-M, 2006 WL 995202, *9 (N.D. Tex. 2006) (citing *DIRECTV v. Budden*, 420 F.3d 521, 529-30 (5th Cir. 2005)). It may include inferences and

opinions so long as they are grounded in personal observation and experience. *See United States v. Cantu*, 167 F.3d 198, 204 (5th Cir. 1999).

Williams avers that he is the Vice President of Business Governance for ConsumerInfo.com, Inc. (CIC), which also does business as ECS, and that he has the authority to make his declaration on behalf of the company. (doc. 44-1 at 2.) It is based on his "own personal knowledge, including knowledge acquired in the course and scope of [his] job responsibilities and through the review of pertinent documents maintained as business records by CIC in the course and scope of CIC's business, documents relating to CIC's internet advertising, and documents relating to sales of CIC's credit products and services." (*Id.*) This is sufficient to establish that Williams has personal knowledge of the matters set forth in his declaration and the attached exhibits. *See Highpoint Risk Servs. LLC v. Companion Prop. & Cas. Ins. Co.*, No. 3:14-CV-3398-L-BH, 2016 WL 4479511, at *7 (N.D. Tex. Aug. 25, 2016). Based on his position with CIC and his familiarity with the details of the case, Williams has the requisite personal knowledge to make the statements at issue. *See Dalton v. FDIC*, 987 F.2d 1216, 1223 (5th Cir. 1993) (holding that a bank employee may gain personal knowledge by reviewing the organization's records). This objection is overruled.

**B.    Hearsay**

Plaintiff also appears to assert a hearsay objection against the documents attached to the Williams declaration. (doc. 51 at 2-3.) Defendant responds that these documents are admissible under the business records exception. (doc. 55 at 7.)

Except in limited circumstances, an out-of-court statement offered to prove the truth of the matter asserted is hearsay, and subject to certain exceptions, is not admissible as evidence. *See* Fed. R. Evid. 801-05. The proponent of hearsay bears the burden of demonstrating that an exception to the

6

hearsay rule applies. *See Broadcast Music, Inc. v. Tex Border Mgmt., Inc.*, No. 3:10-CV-2524-BH, 2012 WL 4119111, at *4 (N.D. Tex. Sept. 18, 2012). Under Rule 803(6) of the Federal Rules of Evidence, "evidence that would otherwise be inadmissible as hearsay is admissible under the business records exception if the requirements for admitting the evidence 'are shown by the testimony of the custodian or another qualified witness.'" *Cline v. Deutsche Bank Nat. Trust Co.*, No. 3:14-CV-1565-D, 2015 WL 4041791, at *3 (N.D. Tex. July 2, 2015) (quoting Fed. R. Evid. 803(6)(D)). "Rule 803(6) allows business records to be admitted if witnesses testify that the records are integrated into a company's records and relied upon in its day to day operations ... [e]ven if the document is originally created by another entity, its creator need not testify when the document has been incorporated into the business records of the testifying entity." *Id.* (citations omitted). Rule 803(6)(E) further provides that if the conditions for admitting a business record are met, the evidence is admissible only if "the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6)(E). Because there is a presumption in favor of admissibility and trustworthiness, the party seeking to exclude such evidence bears the burden of showing a lack of trustworthiness. *See Moss v. Ole South Real Estate, Inc.*, 933 F.2d 1300, 1305 (5th Cir. 1991).

Here, Williams states in his declaration that he is qualified to testify about CIC's business records because his "duties at CIC throughout the course of [his] employment require that [he] be familiar with, among other things, the marketing, advertising and sales of CIC consumer credit products, including services that consumer enroll in at Experian websites, as well as the Terms of Use governing such services." (doc. 44-1 at 1.) He explains that he has reviewed the "pertinent documents maintained as business records by CIC in the course and scope of CIC's business, documents relating

to CIC's internet advertising, and documents relating to sales of CIC's credit products and services," and the documents attached to his declaration are true and correct copies of the originals. (*Id.*) This is sufficient to show that Williams is qualified to offer his declaration and to meet the conditions under Fed. R. Evid. 803(6)(A)-(D) for the business records exception to apply here. *See Rosenberg v. Collins*, 624 F.2d 659, 665 (5th Cir. 1980) ("Any person in a position to attest to the authenticity of certain records is competent to lay the foundation for the admissibility of the records; he need not have been the preparer of the record, nor must he personally attest to the accuracy of the information contained in the records."); *see also* Fed. R. Evid. 803(6)(D).

Plaintiff now has the burden to show that these documents are untrustworthy in accordance with Rule 803(6)(E). *See Moss*, 933 F.2d at 1305. She does not, however, identify any reason why the Williams declaration or the attached documents indicate a lack of trustworthiness, other than her claim that Williams lacks firsthand knowledge of her online transactions. (doc. 51 at 3.) While she argues that Williams's declaration is "not credible" because it and Defendant's motion make different allegations concerning the type of membership in which she had enrolled, she fails to identify the statements that are inconsistent, or explain why any inconsistency is sufficient to show that the declaration is untrustworthy. As discussed, Defendant has sufficiently established that Williams has personal knowledge of the matters and business records set forth in his declaration, such that he is capable of making these sworn statements. *See Johnson v. HomeBridge Fin. Servs.*, No. H-16-0748, 2017 WL 1403300, *4 n.23 (S.D. Tex. Apr. 18, 2017) (overruling hearsay objection to a lender's declaration used as summary judgment evidence because the declarant gained personal knowledge and based his statements on a review of the business records and loan file). Because Plaintiff fails to identify a lack of trustworthiness with the Williams declaration, her hearsay objection is overruled.

### III.  MOTION TO COMPEL

The Federal Arbitration Act (FAA) provides that "a written agreement to arbitrate in any contract involving interstate commerce or a maritime transaction 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 474 (1989) (quoting 9 U.S.C. § 2).  It "embodies the national policy favoring arbitration."  *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006).  The FAA provides "for orders compelling arbitration when one party has failed or refused to comply with an arbitration agreement."  *EEOC v. Waffle House, Inc*., 534 U.S. 279, 289 (2002) (citing 9 U.S.C. §§ 3-4.)  A court may not compel arbitration under the FAA until it is "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." 9 U.S.C § 4.

Courts in the Fifth Circuit employ a two-step inquiry when determining a motion to compel arbitration under the FAA.  *See Fleetwood Enters*., *Inc. v. Gaskamp*, 280 F.3d 1069, 1073 (5th Cir. 2002) (citing *Mitsubishi Motors Corp*. *v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985)).  The first step is to determine whether the parties agreed to arbitrate the dispute at issue.  *Webb v. Investacorp., Inc.*, 89 F.3d 252, 258 (5th Cir. 1996) (per curiam).  This involves consideration of "(1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement." *Safer v. Nelson Fin. Grp., Inc.*, 422 F.3d 289, 294 (5th Cir. 2005) (citations omitted); *accord Webb*, 89 F.3d at 258.  Given the strong federal policy favoring arbitration, "the Supreme Court has held that 'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'" *Safer*, 422 F.3d at 294 (quoting *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983)).  This presumption "does

not apply to the determination of whether there is a valid agreement to arbitrate between the parties,'"

however. *Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 214 (5th Cir. 2003) (quoting

*Fleetwood Enters. Inc. v. Gaskamp*, 280 F.3d 1069, 1073 (5th Cir. 2002)).

The second step is to determine "whether legal constraints external to the parties' agreement

foreclosed the arbitration of those claims." *Safer*, 422 F.3d at 294 (quoting *Webb*, 89 F.3d at 258);

*accord OPE Int'l LP v. Chet Morrison Contractors, Inc.*, 258 F.3d 443, 445-46 (5th Cir. 2001) (per

curiam) (citing *Mitsubishi*, 473 U.S. at 628.). "Only if the court finds there is an agreement to arbitrate

does it consider the second step of whether any legal constraints render the claims nonarbitrable."

*Edwards v. Conn Appliances, Inc.*, No. 3:14-CV-3529-K, 2015 WL 1893107, at *2 (N.D. Tex. Apr.

24, 2015) (citing *Webb*, 89 F.3d at 258).

"While the two-step inquiry used to consider a motion to compel arbitration under the FAA

is well-settled, *Jackson v. Royal Caribbean Cruises, Ltd.*, 389 F. Supp. 3d 431, 443 (N.D. Tex. 2019),

"[t]he quantum of evidence required to prove or disprove the existence of an agreement to arbitrate

is not entirely clear in this Circuit," *Gallagher v. Vokey*, 860 F. App'x 354, 357 (5th Cir. 2021) (citing

*Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 961 F.2d 1148, 1154 (5th Cir. 1992)) ("Our

caselaw has not established the precise showing a party must make."). The Fifth Circuit has explained,

however, that:

> "The party resisting arbitration bears 'the burden of showing that he is entitled to a jury
> trial under § 4 of the Arbitration Act.'" *Dillard*, 961 F.2d at 1154 (quoting *Bhatia v.
> Johnston*, 818 F.2d 418, 422 (5th Cir. 1987)). Further, "the party must make at least
> some showing that under prevailing law, he would be relieved of his contractual
> obligation to arbitrate if his allegations proved to be true ... [and] he must produce at
> least some evidence to substantiate his factual allegations." *Id.* "To put the making of
> the arbitration agreement 'in issue,' " a party is "required to 'unequivocal[ly] den[y]'
> that he agreed to arbitrate and produce 'some evidence' supporting his position."
> *Chester v. DirecTV, LLC*, 607 F. App'x 362, 363-64 (5th Cir. 2015) (per curiam)
> (alterations in original) (quoting *T & R Enters., Inc. v. Cont'l Grain Co.*, 613 F.2d

10

1272, 1278 (5th Cir. 1980)). Although this "some evidence" standard may appear
similar to the summary judgment standard predominant in our sister Circuits, we
need not—and do not—decide whether the 9 U.S.C. § 4 standard in this Circuit is congruent
with the summary judgment evidentiary standard of Rule 56. It is sufficient that, where
competent evidence showing the formation of an agreement to arbitrate has been
presented, § 4 requires a party resisting arbitration to produce *some* contrary evidence
to put the matter "in issue."

*Gallagher*, 860 F. App'x at 357-58.

## A.    Step One-Agreement

As discussed, a court must first consider whether an enforceable agreement to arbitrate exists.

*See Webb*, 89 F.3d at 258.  "In determining the contractual validity of an arbitration agreement, courts

apply ordinary state-law principles that govern the formation of contracts." *Carter v. Countrywide*

*Credit Indus., Inc.*, 362 F.3d 294, 301 (5th Cir. 2004) (citation omitted). "Under Texas law,[3] a binding

contract requires: '(1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3)

a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the

contract with intent that it be mutual and binding.'" *Huckaba v. Ref-Chem, L.P.*, 892 F.3d 686, 689

(5th Cir. 2018) (quoting *In re Capco Energy, Inc.*, 669 F.3d 274, 279-80 (5th Cir. 2012)).

### 1.    Validity of Arbitration Agreement

"Texas courts have recognized the validity of electronic contracts . . . [and] have repeatedly

upheld the validity of 'clickwrap' agreements." *Bongalis-Royer v. RJ Worldwide, LLC*, No.

4:14-CV-330, 2015 WL 12778846, at *4 (E.D. Tex. July 16, 2015) (citing cases); *see Fieldtech*

*Avionics & Instruments, Inc. v. Component Control.Com, Inc.*, 262 S.W.3d 813, 818 n.1 (Tex.

---

[3]Defendant cites to Texas law; Plaintiff did not dispute that Texas law applies. A party who fails to brief the laws
of other states forfeits any choice of law argument. *See Arthur W. Tifford, PA v. Tandem Energy Corp.*, 562 F.3d 699, 705
n.2 (5th Cir. 2009) ("[B]y failing to brief any other state's law, the parties have forfeited any choice of law argument.");
*see also Marsoft, Inc. v. United LNG, L.P.*, No. CIV.A. H-13-2332, 2014 WL 1338709, at *7 n.62 (S.D. Tex. Mar. 31,
2014) ("By failing to brief any other law, Defendant has forfeited a choice of-law argument with regard to its motion to
compel arbitration.") (citing *id.*).

App.—Fort Worth 2008, no pet.) ("Texas courts recognize the validity of clickwrap agreements."). Generally, a "clickwrap agreement" requires the user to assent to the terms of a contract by clicking an "accept" button on the website to complete the transaction. *Am. Eyewear, Inc. v. Peeper's Sunglasses & Accessories, Inc.*, 106 F. Supp.2d 895, 905 n.15 (N.D. Tex. 2000); *see, e.g., In re Online Travel Co.*, 953 F. Supp. 2d 713, 718-20 (N.D. Tex. 2013) (finding "valid clickwrap agreement" where party was required to assent to terms before progressing in online transaction); *Hotels.com, L.P. v. Canales*, 195 S.W.3d 147, 156 (Tex. App.—San Antonio 2006, no pet.) ("By clicking 'I agree to the Terms and Conditions,' the consumer presumably selected to follow through with the contract, consciously aware of the additional terms and conditions and their availability.").

Here, Defendant presents the Williams declaration, screenshots of blank webforms, and the 2018 and 2022 TOU Agreements. (*See* docs. 44-1–44-6.) The declaration states that Plaintiff completed the webforms and clicked the button at the bottom of both forms when she enrolled in CreditWorks on March 21, 2018, and re-enrolled in IdentityWorks on March 22, 2022. (doc. 44-1 at 3, 6-7.) The forms specified that by clicking the button to complete her order, she was accepting and agreeing to the Terms of Use agreement, which contained a hyperlink to the then-current version of the agreement. (docs. 44-2; 44-4.) Plaintiff "would not have been able to successfully enroll in CreditWorks or IdentityWorks unless she clicked that button." (doc. 44-1 at 3-4.)

According to the declaration, the attached 2022 TOU Agreement was in effect when Plaintiff re-enrolled in IdentityWorks on March 22, 2022. (*Id.* at 7.) It provides that "by creating an account with ECS (as defined below), or accessing or using our Services," Plaintiff has "expressly consent[ed] and agree[d] to be bound by this Terms of Use Agreement, and the terms, conditions, and notices contained or referenced herein. . . ." (doc. 44-6 at 2.) ECS affiliates are included in the definition of

12

"ECS", which in turn is an affiliate of Defendant. (*Id.*; doc. 44-1 at 2-3.)

The 2022 TOU Agreement contains an arbitration provision, which states that "ECS and you agree to arbitrate all disputes and claims between us arising out of or relating to this Agreement," including "claims arising out of or relating to any aspect of the relationship between us arising out of any Service or Website, whether based in contract, tort, statute (including, without limitation, the Credit Repair Organizations Act) fraud, misrepresentation or any other legal theory; claims that arose before this or any prior Agreement (including, but not limited to, claims relating to advertising); claims that are currently the subject of purported class action litigation in which you are not a member of a certified class; and claims that may arise after the termination of this Agreement." (*Id.* at 7.) It further states that "[f]or purposes of this arbitration provision, references to 'ECS,' 'you,' and 'us' shall include our respective . . . affiliates . . . , websites of the foregoing, as well as all authorized or unauthorized users or beneficiaries of Services and/or Websites or information under this or prior Agreements between us relating to Services and/or Websites." (*Id.*)

Based on this evidence, Defendant has met its initial burden to show that there is an arbitration agreement.

  i.  *No Evidence*

Plaintiff argues that there is no evidence that she "entered into any agreement with the fictitious corporation [ ] Experian." (doc. 51 at 1-2.) Although her response is sworn, her self-serving statement without more is sufficient to rebut Defendant's evidence. *See Am. Heritage Life Ins. Co. v. Orr*, 294 F.3d 702, 710 (5th Cir. 2002) (holding that self-serving affidavits that "amount to nothing more than hollow, bald assertions" do not approach the type of evidence required to bring the "making of the arbitration" agreement into question). Defendant's evidence shows that Plaintiff accepted the

2022 TOU Agreement when she clicked the online button to re-enrolled in IdentityWorks on March 22, 2022. (See doc. 44-1 at 6-7.) Texas courts have found that "assent through an affirmative 'click' is sufficient to bind the parties." *Yiru v. WorldVentures Holdings LLC*, No. 3:17-CV-02155-S, 2018 WL 4346158, at *3 (N.D. Tex. Sept. 11, 2018). The evidence also shows that Plaintiff could not complete enrollment without assenting to the 2022 TOU Agreement by clicking the button on the webform. *See In re Online Travel Co.*, 953 F. Supp.2d 713, 719 (N.D. Tex. 2013) (finding sufficient evidence that plaintiffs manifested assent as "it was impossible to complete a transaction on the Travelocity website in the absence of affirmative assent to the User Agreement"); *see, e.g., May v. Expedia, Inc.*, No. A-16-CV-1211-RP, 2018 WL 4343445, at *3 (W.D. Tex. July 19, 2018), *adopted by* 2018 WL 4343427 (W.D. Tex. Aug. 27, 2018) (finding plaintiff was bound to the terms of the Terms and Conditions, including its arbitration provision, where website "required the user to click a 'Continue' button to complete the transaction, and directly above the 'Continue' button informed the user that '[b]y clicking 'Continue' you are agreeing to our Terms and Conditions and Privacy Policy'"). Defendant is a party to the 2022 TOU Agreement because the definition of "ECS" includes affiliates, and the undisputed record shows that ECS is an affiliate of Defendant. (docs. 44-1 at 2-3; 44-6 at 2.)[4]

Plaintiff also denies that Defendant has proof that she has "any subscription with any of [its] corporations or affiliates," that she ever clicked a button agreeing to "Terms and Conditions," or that

---

[4]Notably, the Western District of Texas and the Ninth Circuit recently considered the same arbitration provision under similar circumstances, and both similarly held that Defendant had contractual authority to compel arbitration. *See Roberson v. Experian Info. Sols., Inc.*, No. SA-21-CV-00316-JKP, 2022 WL 62270, at *4 (W.D. Tex. Jan. 5, 2022) ("The arbitration provision of the Terms of Use Agreement therefore constitutes a valid and enforceable arbitration agreement between Plaintiff and Experian."); *Meeks v. Experian Info. Servs., Inc.*, No. 21-17023, 2022 WL 17958634, at *2 (9th Cir. Dec. 27, 2022) ("The text of the arbitration provision binds plaintiffs to arbitrate with ECS and defines ECS to include 'affiliates,' and Experian is an affiliate and was so when the plaintiffs entered into the agreement."); *see also Morgan v. Experian Info. Sols., Inc.*, No. C21-5783-JCC, 2022 WL 681359, at *1 (W.D. Wash. Mar. 4, 2022) (finding same arbitration provision applied to ECS affiliates including Defendant).

she ever signed a contract where she "willingly, knowingly, or intentionally gave up [her] rights to a jury trial" (doc. 51 at 2-3), but "[t]hese statements fall far short of the requisite unequivocal denial" to put the making of the arbitration agreement "in issue." *Soni v. Solera Holdings, L.L.C.*, No. 21-10428, 2022 WL 1402046, at *4 (5th Cir. May 4, 2022); *see also Gallagher*, 860 F. App'x at 357 (cleaned up) ("To put the making of the arbitration agreement 'in issue,' a party is required to 'unequivocally deny' that he agreed to arbitrate and produce 'some evidence' supporting his position."). Plaintiff does not expressly deny clicking the button on the webforms or enrolling in an ECS membership.  Other than her bare sworn denial, she provides no contrary evidence sufficient to put the existence of an agreement "in issue."  *See Gallagher*, 860 F. App'x at 357-58.

    *ii.*    *Duress*

Plaintiff next alleges that any agreement to arbitration between her and Defendant would have been "under duress". (doc. 51 at 4.) To prove that she consented to the arbitration provision under duress, she must show that Defendant "obtained [her] consent by threatening to do something that it had no legal right to do." *Lester v. Advanced Env't Recycling Techs., Inc.*, 248 F. App'x 492, 495 (5th Cir. 2007); *see Osorno v. Osorno*, 76 S.W.3d 509, 511 (Tex. App.—Houston [14th Dist.] 2002, no pet.) ("For duress to be a contract defense, it must consist of a threat to do something the threatening party has no right to do."). Plaintiff has not offered any evidence to show that the circumstances surrounding her decision to enroll in an ECS membership resulted from any coercive acts or improper threats by Defendant. Her unsubstantiated allegation of duress does not meet her burden to present some evidence demonstrating that the arbitration agreement was invalid on this basis.

    *iii.*    *Unconscionablility*

Finally, Plaintiff appears to argue that the arbitration agreement is unconscionable because the

2022 TOU Agreement "fails to provide consumers with any negotiating power or meaningful choice" as they must waive all rights to a jury trial "to know what is being reported in their consumer credit file." (doc. 51 at 3.)

In Texas, an unconscionable contract is unenforceable. *See In re Poly-Am., L.P.*, 262 S.W.3d 337, 348 (Tex. 2008).  Unconscionability under Texas law can either be procedural, if it involves circumstances surrounding the adoption of the arbitration provision, or substantive, if it concerns the fairness of the arbitration provision itself. *Carter v. Countrywide Credit Indus., Inc.*, 362 F.3d 294, 301 (5th Cir. 2004) (citing *In re Halliburton Co.*, 80 S.W.3d 566, 571 (Tex. 2002)).  "In determining whether an agreement is unconscionable, the court must examine 'the entire atmosphere in which the agreement was made; the alternatives, if any, available to the parties at the time the contract was made; the 'nonbargaining ability' of one party; whether the contract was illegal or against public policy; and whether the contract was oppressive or unreasonable.'" *Fat Butter, Ltd v. BBVA USA Bancshares, Inc*, 4:09-CV-3053, 2010 WL 11646900, at *16 (S.D. Tex. Apr. 13, 2010), *adopted sub nom. by* 2010 WL 8756271 (S.D. Tex. Apr. 29, 2010) (quoting *Alamo Moving & Storage One Corp. v. Mayflower Transit L.L.C.*, 46 F. App'x 731, 2002 WL 1973484, at *2 (5th Cir. July 31, 2002)).  "The burden of proving unconscionability rests on the party seeking to invalidate the arbitration agreement." *Id.*  The court may only evaluate the unconscionability of the arbitration provision, not the contract as a whole. *Banc One Acceptance Corp. v. Hill*, 367 F.3d 426, 430 (5th Cir. 2004).

Plaintiff does not present any evidence to meet her burden to show that the agreement to arbitrate between her and Defendant is procedurally or substantively unconscionable. There is no evidence in the record that the process through which she entered into the 2022 TOU Agreement was unfair or oppressive. *See BDO Seidman, LLP v. J.A. Green Dev. Corp.*, 327 S.W.3d 852, 858–59 (Tex.

App.—Dallas 2010, no pet.) (explaining that procedural unconscionability examines "the contract formation process and the alleged lack of meaningful choice"). She also fails to identify facts demonstrating that the arbitration provision itself is so unfair and one-sided that it is unconscionable. *See Pacheco v. PCM Const. Servs., L.L.C.*, 2014 WL 145147, at *4 (N.D. Tex. 2014), *aff'd by* 602 F. App'x. 945 (5th Cir. 2015) (quoting *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 757 (Tex. 2001)) ("[T]he basic test for [substantive] unconscionability is whether ... the clause involved is so one-sided that it is unconscionable under the circumstances existing when the parties made the contract."). While Plaintiff argues that she could not view her consumer credit file without waiving her rights to a jury trial, "[t]he mere fact that the arbitration clause requires her to submit her claims to an arbitral forum, rather than judicial, does not strip away her rights under the available statutes." *Elkjer v. Scheef & Stone, L.L.P.*, 8 F. Supp.3d 845, 856-57 (N.D. Tex. 2014). Further, a contract is not procedurally or substantively unconscionable simply because it results from a "take it or leave it" offer. *See In re AdvancePCS Health L.P.*, 172 S.W.3d 603, 608 (Tex. 2005) (holding that a contract was not procedurally unconscionable simply because plaintiffs were "forced to accept it"); *In re Palm Harbor Homes, Inc.*, 195 S.W.3d 672, 678 (Tex. 2006) (holding that the fact plaintiffs could not complete purchase "unless they signed the arbitration agreement does not, in and of itself, make the agreement substantively unconscionable").   Plaintiff has not met her burden to show that the arbitration agreement is unconscionable.

In conclusion, Plaintiff has not met her burden to produce *some* contrary evidence to put the matter whether an arbitration agreement exists "in issue." *Gallagher*, 860 F. App'x at 357-58.

### 2.    *Scope*

Defendant argues that the arbitration agreement contains a valid delegation clause, which

delegates authority to determine issues of arbitrability to the arbitrator. (doc. 44 at 21.)

Although the analysis of whether the parties agreed to arbitrate includes consideration of the scope of an arbitration agreement, when the agreement "contains a delegation clause giving the arbitrator the primary power to rule on the arbitrability of a specific claim, the analysis changes." *Clark v. Nordstrom, Inc.*, No. 3:18-CV-2100-D, 2019 WL 3428947, at *2 (N.D. Tex. July 30, 2019) (citing *Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 201 (5th Cir. 2016)). Under the FAA, parties may delegate questions to an arbitrator, including questions regarding the scope of the arbitration provision itself. *See Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 69 (2010). Delegation clauses transfer the power to decide the question of arbitrability from the courts to the arbitrator. *Kubala*, 830 F.3d at 202 (citing *id.* at 68-69). Courts may not assume that the parties have delegated to arbitration the questions of validity or scope, however, absent clear and unmistakable evidence of their intent to do so. *See Arnold v. Homeaway, Inc.*, 890 F.3d 546, 552 (5th Cir. 2018) (citing *First Options*, 514 U.S. at 944-45); *see also AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986). The party arguing "that an arbitrator has authority to decide arbitrability 'bears the burden of demonstrating clearly and unmistakably that the parties agreed to have the arbitrator decide that threshold question.'" *Hous. Ref., L.P. v. United Steel, Paper & Forestry, Rubber, Mfg.*, 765 F.3d 396, 408 (5th Cir. 2014) (quoting *ConocoPhillips, Inc. v. Local 13-0555 United Steelworkers Int'l Union*, 741 F.3d 627, 630 (5th Cir. 2014)).

Defendant presents evidence showing that the 2022 TOU Agreement includes a delegation clause that gives the arbitrator the primary authority to decide disputes regarding enforceability and arbitrability. (doc. 44-6 at 8.) It provides:

> All issues are for the arbitrator to decide, including the scope and enforceability of this arbitration provision as well as the Agreement's other terms and conditions, and the

18

arbitrator shall have exclusive authority to resolve any such dispute relating to the scope and enforceability of this arbitration provision or any other term of this Agreement including, but not limited to any claim that all or any part of this arbitration provision or Agreement is void or voidable.

(*Id.*) The presence of a valid delegation clause requires that a claim be referred "to arbitration to allow the arbitrator to decide gateway arbitrability issues." *Kubala*, 830 F.3d at 203; see also Maravilla v. Gruma Corp., 783 F. App'x 392, 395 (5th Cir. 2019) (finding that if plaintiff challenges the enforcement of a contract rather than the formation, it properly heard by the arbitrator). Absent a direct challenge to the delegation clause by the plaintiff, when a party seeking to compel arbitration "points to a purported delegation clause, the court's analysis is limited." *Harris v. Tucker Entm't, LLC.*, No. 3:20-CV-651-L-BK, 2020 WL 6370160, at *2 (N.D. Tex. Oct. 6, 2020), *adopted sub nom. by* 2020 WL 6363877 (N.D. Tex. Oct. 29, 2020) (citing *Kubala*, 830 F.3d at 201.) "If there is a delegation clause, the motion to compel arbitration should be granted in almost all cases." *Id.* But when a plaintiff directly attacks the validity of the delegation clause, rather than the validity of the arbitration provision or the contract as a whole, the court, not an arbitrator, "must first consider the challenge before ordering compliance with that agreement under [FAA] § 4." *Rent-A-Ctr., W., Inc.*, 561 U.S. at 71.

Here, Plaintiff does not directly challenge the delegation clause or argue that her claims are outside the scope of the 2022 TOU Agreement. *See Grant*, 469 F. App'x at 315 ("[T]he burden shifts to the party opposing arbitration to demonstrate either that the agreement is invalid or, at a minimum, to allege the dispute is outside of the agreement's scope."). Accordingly, there is no challenge that must be considered before submitting her claims to arbitration as agreed to under the agreement. *See Rent-A-Ctr., W., Inc.*, 561 U.S. at 71. Because the 2022 TOU Agreement includes a valid delegation provision, and Plaintiff does not directly challenge the delegation provision, it is for the arbitrator, and not the court, to decide threshold questions, including the scope of the arbitration.

Because Plaintiff has not shown why the arbitration agreement should not be enforced, she is bound by the terms of the agreement to arbitrate.

## B.    Step Two–Legal Restraints

The next step is to determine whether any legal restraints external to the agreement foreclose arbitration of Plaintiff's claims. *See OPE Int'l LP*, 258 F.3d at 445-46.  Here, Plaintiff does not argue that any external legal constraints exist. (*See* doc. 51.)  She should be compelled to submit her claims to arbitration. *See, e.g., Tanoury v. Symphony Serv. Corp.*, No. 3:12-CV-1142-L, 2013 WL 705121, at *5 (N.D. Tex. Feb. 5, 2013), *adopted by* 2013 WL 706048 (N.D. Tex. Feb. 27, 2013).

## IV.  MOTION FOR MANDATORY STAY

Defendant moves for a mandatory stay under § 3 of the FAA. (doc. 44 at 28.)

Under § 3 of the FAA, a court must stay the trial of the action until arbitration is complete if it determines that the claims are properly referable to arbitration and one of the parties applies for a stay of the proceedings. 9 U.S.C. § 3; *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992). A stay is mandatory upon a showing that the opposing party has commenced suit "upon any issue referable to arbitration under an agreement in writing for such arbitration." *Id.*; *accord Mun. Energy Agency of Miss. v. Big Rivers Elec. Corp.*, 804 F.2d 338, 342 (5th Cir. 1986). When all of the issues before the court are arbitrable and there are no other reasons to retain jurisdiction over the suit, it may dismiss the action. *See Fedmet Corp. v. M/V BUYALYK*, 194 F.3d 674, 678 (5th Cir. 1999) (noting the Fifth Circuit has "interpreted [9 U.S.C. § 3] to mean only that the district court cannot deny a stay when one is properly requested") (citing *Alford*, 975 F.2d at 1164).

While the FAA's mandatory stay provision normally only applies to the signatories of an arbitration agreement, the Fifth Circuit has recognized that "exceptional circumstances" may exist to

warrant an exception to this general rule. *See Adams v. Georgia Gulf Corp.*, 237 F.3d 538, 540 (5th Cir. 2001) (citing *Harvey v. Joyce*, 199 F.3d 790 (5th Cir. 2000) and *Subway Equip. Leasing Corp. v. Forte*, 169 F.3d 324 (5th Cir. 1999)). In determining whether mandatory stay under § 3 is warranted for nonsignatories, courts should consider whether: (1) the arbitrated and litigated disputes involve the same operative facts; (2) the claims asserted in the arbitration and litigation are "inherently inseparable"; and (3) the litigation has a "critical impact" on the arbitration. *Rainier DSC 1, L.L.C. v. Rainier Capital Mgmt., L.P.*, 828 F.3d 356, 360 (5th Cir. 2016) (citing *Waste Management v. Residuos Industriales Multiquim, S.A. de C.V.*, 372 F.3d 339, 343 (5th Cir. 2004)). "The question is not ultimately one of weighing potential harm to the interests of the non-signatory, but of determining whether proceeding with litigation will destroy the signatories' right to a meaningful arbitration." *Waste Management*, 372 F.3d at 343.

Here, Defendant generally argues that "the litigation is subject to a mandatory stay and should be stayed pending completion of the arbitration." (doc. 44 at 28.) As discussed, all of Plaintiff's claims against Defendant are subject to arbitration. Plaintiff also asserts claims against defendants who were not parties to the arbitration agreement, however, but Defendant fails to address the three factors necessary to show that mandatory stay of the litigation involving parties not subject to arbitration is warranted. Accordingly, its motion for mandatory stay under § 3 should be denied.

## V. RECOMMENDATION

Defendant's motion to compel arbitration should be **GRANTED,** and its motion for mandatory stay should be **DENIED**. All claims against Defendant should be **DISMISSED with prejudice**.

**SO RECOMMENDED** this 23rd day of January, 2023.

_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

### I  NSTRUCTIONS FOR SERVICE AND
### NOTICE OF RIGHT TO APPEAL/OBJECT

        A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. _See_ 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  _See Douglass v. United Servs. Automobile Ass'n_, 79 F.3d 1415, 1417 (5th Cir. 1996).

_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE